**UNITED STATES BANKRUPTCY COURT**
 **WESTERN DISTRICT OF NORTH CAROLINA**

**CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| ALDRICH PUMP LLC, *et al.*,[1] | Case No. 20-30608 (JCW) |
| Debtors. | (Jointly Administered) |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, on behalf of the estates of Aldrich Pump LLC and Murray Boiler LLC, | |
| Plaintiff, | Adv. Pro. No. _____ |
| v. | |
| INGERSOLL-RAND GLOBAL HOLDING COMPANY LIMITED, TRANE TECHNOLOGIES HOLDCO INC., TRANE TECHNOLOGIES COMPANY LLC, TRANE INC., TUI HOLDINGS INC., TRANE U.S. INC., and MURRAY BOILER HOLDINGS LLC, | |
| Defendants. | |

**<u>COMPLAINT</u>**

The Official Committee of Asbestos Personal Injury Claimants (the "<u>Committee</u>" or

"<u>Plaintiff</u>"), on behalf of the estates of the debtors, Aldrich Pump LLC ("<u>Aldrich</u>") and Murray

Boiler LLC ("<u>Murray</u>," and together with Aldrich, the "<u>Debtors</u>"), by and through its undersigned

attorneys, for its Complaint in the above-captioned action against defendants Ingersoll-Rand

Global Holding Company Limited ("<u>IRGH</u>"), Trane Technologies HoldCo Inc. ("<u>TT HoldCo</u>"),

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Aldrich Pump LLC (2290) and Murray Boiler LLC (0679).  The Debtors' address is 800-E Beaty Street, Davidson, North Carolina 28036.

Trane Technologies Company LLC ("New TTC"), Trane Inc., TUI Holdings Inc. ("TUI Holdings"), Trane U.S. Inc. ("New Trane"), Murray Boiler Holdings LLC ("Murray Holdings," and together with IRGH, TT HoldCo, New TTC, Trane Inc., TUI Holdings, and New Trane, the "Defendants"), alleges the following:[2]

## NATURE OF THE ACTION

1.      Defendants perpetrated intentional and constructive fraudulent transfers by implementing two divisional mergers, purportedly in compliance with Texas law, to divide entities within the Trane Organization[3] so as to separate the Trane Organization's valuable assets and non-asbestos liabilities from its asbestos liabilities and filing bankruptcies to hinder, delay and defraud asbestos victims.

2.      One divisional merger was undertaken to divide the former Ingersoll-Rand Company ("Ingersoll-Rand")[4] to:

  a.  Create Aldrich, a shell company with no employees or operations of its own, to which Ingersoll-Rand allocated all of Ingersoll-Rand's asbestos liabilities and approximately 1% of its assets;

  b.  Create Trane Technologies Company LLC ("New TTC"), to which Ingersoll-Rand allocated approximately 99% of Ingersoll-Rand's assets, profitable operations, and non-asbestos liabilities; and

  c.  File a pre-planned bankruptcy petition for Aldrich on June 18, 2020, just 49 days

---

[2] Certain allegations set forth herein concern matters that are solely within Defendants' knowledge or control and are therefore made upon information and belief.

[3] The "Trane Organization" refers to Trane Technologies plc (formerly known as Ingersoll-Rand plc) and its subsidiaries and affiliates including Defendants and their predecessors.

[4] As explained below, shortly before the divisional merger, Ingersoll-Rand merged with and into Trane Technologies Company LLC ("Old TTC"), a limited liability company formed by TT HoldCo, and thus was known at the time of the divisional merger as Trane Technologies Company LLC (Old TTC).

after Aldrich's formation (collectively, the "Ingersoll-Rand Corporate Restructuring").

3.  On the same day, the former Trane U.S. Inc. ("Old Trane"[5]) undertook its own divisional merger to:

a.  Create Murray, a shell company with no employees or operations of its own, to which Old Trane allocated all of Old Trane's asbestos liabilities and approximately 2% of its assets;

b.  Create Trane U.S. Inc. ("New Trane"), to which Old Trane allocated approximately 98% of Old Trane's assets, profitable operations, and non-asbestos liabilities; and

c.  File a pre-planned bankruptcy petition for Murray on June 18, 2020, just 49 days after Murray's formation (collectively, the "Old Trane Corporate Restructuring," and together with the Ingersoll-Rand Corporate Restructuring, the "Corporate Restructuring").[6]

4.  These corporate transactions and the resulting bankruptcies are commonly referred to as the "Texas Two-Step," an attorney-designed strategy to (i) create separate "good" companies with all the assets and non-asbestos liabilities and "bad" companies with all the asbestos liabilities, and (ii) file bankruptcy petitions for the "bad" companies and use the bankruptcy process to hinder, delay and defraud the claims of asbestos victims.  The Texas Two-Step has been perpetrated in several cases, including *In re Bestwall LLC*, No. 17-31795 (Bankr. W.D.N.C.) ("*Bestwall*"), *In re*

---

[5] "Old Trane" refers to the entity named Trane U.S. Inc. prior to the May 1, 2020 Corporate Restructuring.  "New Trane" refers to the entity named Trane U.S. Inc. that was created as part of the May 1, 2020 Corporate Restructuring.

[6] The corporate transactions are more fully described in, *inter alia*, the *Declaration of Ray Pittard in Support of First Day Pleadings*, dated June 18, 2020 (ECF No. 27), and in the *Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting in Part Denying in Part the Motion to Compel*, Adv. Proc. 20-03041 (JCW), dated August 23, 2021 (ECF No. 308).  References to "ECF No." shall refer to documents filed in the base case bankruptcy fashioned *In re Aldrich Pump LLC*, No. 20-30608 (JCW) (Bankr. W.D.N.C.).

*DBMP LLC*, No. 20-30080 (Bankr. W.D.N.C.) ("*DBMP*"), and *In re LTL Management, LLC*, Case

No. 21-30589 (MBK) (Bankr. D.N.J. 2022).

5.      The Texas Two-Step violates the fundamental purpose of applicable state law and

the Bankruptcy Code.  The "principal purpose of bankruptcy is straightforward: to grant a fresh

start to the honest but unfortunate debtor,"[7]  who has "placed the rectitude of [its] prior dealings

before the Court,"[8] and prohibits "the use of the bankruptcy court, a court of equity, to further a

fraudulent purpose."[9]  Here, the Debtors admittedly were *created* and allocated all of the Trane

Organization's asbestos liabilities to exploit the bankruptcy process, by commencing an adversary

proceeding to enjoin all asbestos actions against the entire Trane Organization, and use

bankruptcy's estimation process to reduce asbestos claims and obtain a release of such liabilities

without subjecting the entire Trane Organization to the bankruptcy regime.  These Debtors can

hardly be described as "honest but unfortunate."

6.      Through the Debtors' divisional mergers and subsequent bankruptcies, Defendants

have hindered, delayed, and ultimately seek to fraudulently reduce or eliminate the ability of

asbestos victims to recover what was, is, or will be due to them.  Defendants' treatment of their

obligations to asbestos victims stands in sharp contrast to their treatment of their non-asbestos

obligations, which New TTC, New Trane, and their affiliates continue to timely pay in the ordinary

course.

7.      Defendants acted in concert and conspired on a fraudulent scheme designed to strip

---

[7] *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 448 (4th Cir. 2007) (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)) (remaining citations and internal quotation marks omitted).

[8] *Brown v. Felsen*, 442 U.S. 127 (1979) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[9] *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 764 (1st Cir. 1983) (court raising, *sua sponte*, whether the bankruptcy court had jurisdiction over the matter, as "[t]he record suggests that . . . this case may run afoul of certain very basic bankruptcy principles," including, without limitation, the prohibition on "the use of the bankruptcy court, a court of equity, to further a fraudulent purpose").

the valuable assets of Ingersoll-Rand and Old Trane from their significant asbestos liabilities and

file bankruptcy petitions for the entities laden with those asbestos liabilities (Aldrich and Murray)

in order to hinder and delay payment of those liabilities and to use the bankruptcy claims process

to delay and seek to avoid or reduce recoveries to asbestos victims and abridge or even eradicate

their rights.

8.      The divisional mergers—step one in the two-part dance—were essential to

Defendants' scheme, as they allowed the Trane Organization (other than Aldrich and Murray) to

continue to operate outside of bankruptcy while taking advantage of the bankruptcy process with

respect to asbestos claims.

9.      The bankruptcies of Aldrich and Murray were an equally essential component—

step two—of Defendants' scheme, as the bankruptcies permitted Defendants to gain leverage

against asbestos victims—many of whom are gravely ill or dying—and their families, estates, and

heirs.  Aldrich's and Murray's bankruptcies have stayed, and continue to stay, all pending litigation

(and also cut off related defense costs for Defendants) and delayed payments to asbestos victims

and their families, estates, and heirs for years.  In addition, asbestos victims and their families,

estates, and heirs are subjected to the bankruptcy claims process and estimation so as to delay and

deprive asbestos victims of due process and reduce or eliminate recoveries to asbestos victims.

10.     The divisional mergers and Aldrich and Murray bankruptcies also constitute a

constructive fraudulent transfer.  Specifically, the divisional mergers comprised transfers of assets

and the incurrence of obligations involving Aldrich and Murray (i) rendering each insolvent,

(ii) within two years of the Petition Date (defined below) of Aldrich and Murray; and (iii) for

which Aldrich and Murray received less than reasonably equivalent value in exchange.  The

supposed value that the prepetition Debtors received was a prepetition "Funding Agreement,"

which, far from a blanket promise to pay all liabilities of the Debtors, was an executory contract capable of being rejected in the bankruptcy that had already been planned for, and promised funding only under certain conditions, including, without limitation, only upon the confirmation and consummation of a plan that included "all of the protections of section 524(g) of the Bankruptcy Code" for the entire Trane organization. Such an agreement can hardly be described as reasonably equivalent value. In addition, the Corporate Restructuring was intended to incur, or Aldrich and Murray and their affiliates believed or reasonably should have believed that Aldrich and Murray would incur, debts beyond the Debtors' ability to pay as they became due, including, without limitation, pursuant to prepetition "Support Agreements" in which the Aldrich and Murray indemnified the entire Trane Organization for all pending and future asbestos liabilities.

## JURISDICTION AND VENUE

11.    This is a proceeding arising under or relating to the bankruptcy petitions filed by Aldrich and Murray under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). *See In re Aldrich Pump LLC*, No. 20-30608 (JCW) (Bankr. W.D.N.C. June 18, 2020); *In re Murray Boiler LLC*, No. 20-30609 (JCW) (Bankr. W.D.N.C. June 18, 2020). As a result, this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b).

12.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

13.    Aldrich Pump LLC is a North Carolina limited liability company with a service address at a registered agent located at 2626 Glenwood Avenue, Suite 550, Raleigh, North Carolina 27608, and with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina 28036, and is a debtor whose bankruptcy is pending in this Court. Debtor Aldrich Pump

LLC is a successor of Old TTC and Old TTC's predecessor, Ingersoll-Rand.

14.     Murray Boiler LLC is a North Carolina limited liability company with a service address at a registered agent located at 2626 Glenwood Avenue, Suite 550, Raleigh, North Carolina 27608, and with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina 28036, and is a debtor whose bankruptcy is pending in this Court.  Debtor Murray Boiler LLC is a successor of Old Trane.

15.     Plaintiff Official Committee of Asbestos Personal Injury Claimants is a statutory committee of creditors appointed by this Court pursuant to an Order dated July 7, 2020 (ECF No. 147), that (i) is comprised of individuals who assert present or pending claims against the Debtors for personal injury or wrongful death arising from, or attributable to, exposure to asbestos or asbestos-containing products, and (ii) has been granted standing to commence this action on behalf of the estates of the Debtors pursuant to an order dated April 14, 2022 (ECF No. 1121).

16.     Defendant Ingersoll-Rand Global Holding Company Limited (referred to herein as IRGH) is a Delaware company with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina, 28036.  As set forth herein, Defendants completely dominate the Debtors, such that the Debtors are the alter egos or mere instrumentalities of Defendants.

17.     Defendant Trane Technologies HoldCo. Inc. (referred to herein as TT HoldCo) is a Delaware corporation with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina, 28036.  As set forth herein, Defendants completely dominate the Debtors, such that the Debtors are the alter egos or mere instrumentalities of Defendants.

18.     Defendant Trane Technologies Company LLC (referred to herein as New TTC) is a Delaware limited liability company with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina 28036.  As set forth herein, Defendants completely dominate the

Debtors, such that the Debtors are the alter egos or mere instrumentalities of Defendants.  In addition, as set forth herein, New TTC is a successor of Old TTC and Old TTC's predecessor, Ingersoll Rand, and is liable as such.

19.     Defendant Trane Inc. is a Delaware corporation with its principal place of business located at One Centennial Avenue, Piscataway, New Jersey 08854. As set forth herein, Defendants completely dominate the Debtors, such that the Debtors are the alter egos or mere instrumentalities of Defendants.

20.     Defendant TUI Holdings Inc. (referred to herein as TUI Holdings) is a Delaware corporation with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina, 28036.  As set forth herein, Defendants completely dominate the Debtors, such that the Debtors are the alter egos or mere instrumentalities of Defendants.

21.     Defendant Trane U.S. Inc. (referred to herein as New Trane) is a Delaware corporation with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina 28036.  As set forth herein, Defendants completely dominate the Debtors, such that the Debtors are the alter egos or mere instrumentalities of Defendants.  In addition, as set forth herein, New Trane is a successor of Old Trane and is liable as such.

22.     Defendant Murray Boiler Holdings LLC (referred to herein as Murray Holdings) is a Delaware limited liability company with its principal place of business located at 800-E Beaty Street, Davidson, North Carolina, 28036.  As set forth herein, Defendants completely dominate the Debtors, such that the Debtors are the alter egos or mere instrumentalities of Defendants.

## PROCEDURAL BACKGROUND

23.     On June 18, 2020 (the "Petition Date"), Debtors Aldrich and Murray filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the Western District of North Carolina.  *See In re Aldrich Pump LLC*, No. 20-30608 (JCW) (Bankr. W.D.N.C. June 18, 2020); *In re Murray Boiler LLC*, No. 20-30609 (JCW) (Bankr. W.D.N.C. June 18, 2020).

24.     Also on the Petition Date, Debtors commenced an adversary proceeding and requested a temporary restraining order and sought a preliminary injunction of asbestos lawsuits nationwide against Defendants TT HoldCo, New TTC, Trane Inc., TUI Holdings, New Trane, and Murray Holdings; their affiliates; and others.  *See Aldrich Pump LLC and Murray Boiler LLC v. Those Parties Listed on Appendix A to Complaint and John and Jane Does 1-1000*, Adv. Pro. No. 20-03041 (JCW) (Bankr. W.D.N.C. June 18, 2020) (the "Preliminary Injunction Adversary Proceeding").

25.     The Debtors also filed on the Petition Date a *Motion for an Order Directing the Joint Administration of Their Chapter 11 Cases* (ECF No. 3), which the Court granted on June 25, 2020, *see* Order Directing the Joint Administration of the Debtors' Chapter 11 Cases (Dkt. No. 114).

26.     Since the Petition Date, the Debtors have continued in possession of their property and have managed their business, as debtors in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the chapter 11 case.

27.     On June 30, 2020, the Bankruptcy Administrator filed a motion to appoint an official committee of asbestos personal injury claimants (ECF No. 126), which the Court granted as modified in an Order dated July 7, 2020 (ECF No. 147).

28.     On January 25, 2021, the Debtors filed a *Motion for Partial Summary Judgment that all Actions Against the Protected Parties to Recover Aldrich/Murray Asbestos Claims are Automatically Stayed by Section 362 of the Bankruptcy Code*, (Adv. Proc. 20-03041 ECF No. 90),

arguing that all estate claims, including fraudulent transfer, alter ego and successor liability claims against the Defendants and others are subject to the automatic stay pursuant to section 362(a)(3) of the Bankruptcy Code because they are property of the estate (the "Summary Judgment Motion").

29.    On August 23, 2021, the Court issued its *Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting in Part Denying in Part the Motion to Compel* (Adv. Proc. 20-03041 ECF No. 308) (the "Findings and Conclusions").

30.    That same day, on August 23, 2021, the Court also granted the Debtors' Summary Judgment Motion and entered an *Order Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, Preliminarily Enjoining Such Actions, and Granting in Part and Denying in Part the Motion to Compel* (Adv. Proc. 20-03041 ECF No. 307).

31.    On April 14, 2022, the Court granted Plaintiff standing to commence this Adversary Proceeding on behalf of the estates of the Debtors (ECF No. 1121) so as to assert claims with respect to, arising from, or otherwise related to the Corporate Restructuring and the transactions and decisions that led to the filing of bankruptcy petitions for Aldrich and Murray.

## FACTUAL ALLEGATIONS

### I.    CORPORATE BACKGROUND AND HISTORY OF ASBESTOS LIABILITIES

#### A.    Corporate History

32.    Ingersoll Rock Drill Company commenced operations in 1871 and eventually took the name Ingersoll-Sargent Drill Company.  Merging with Rand Drill Company in 1905, the resulting entity, Ingersoll-Rand Company ("Ingersoll-Rand"), became a global provider of industrial equipment and technology.  As part of its business, Ingersoll-Rand historically produced

pumps and compressors that used asbestos-containing products such as gaskets and packing bought from suppliers.

33.     In 2002, Ingersoll-Rand engaged in a tax-shelter transaction in which the company's ultimate parent, Ingersoll-Rand plc ("IR plc") (now known as Trane Technologies plc), incorporated in Bermuda.  In June 2008, IR plc acquired heating ventilation and air conditioning ("HVAC") supplier Trane U.S. Inc. (formerly known as American Standard Companies, Inc.) and its affiliates (collectively, "Old Trane"), as well as the additional asbestos liabilities stemming from Old Trane's asbestos-containing boilers and HVAC components.  In 2009, IR plc reincorporated in Ireland.  Ingersoll-Rand remained incorporated in New Jersey as a subsidiary of IR plc.  By the close of 2019, IR plc held more than $20.5 billion in assets, had revenue totaling over $13 billion, and had a market capitalization of approximately $31 billion.

### B.     Source of Asbestos Liabilities

34.     According to the Debtors, as of the Petition Date Ingersoll-Rand and Old Trane were defendants in roughly 100,000 lawsuits filed throughout the United States seeking compensation for asbestos-induced personal injury or wrongful death.[10]    The Debtors' predecessors historically paid approximately $95 million per year for asbestos-related settlements and defense costs.  In total, Ingersoll-Rand and Old Trane have paid nearly $2 billion in asbestos-related indemnity and defense costs.

35.     Moreover, because asbestos diseases have long latency periods, those exposed may not show symptoms of disease, such as mesothelioma, for 40 years or longer.  As a result, claims against the Debtors for their predecessors' asbestos torts will continue to accrue into the future.

---

[10] *See, e.g.*, Schedules of Assets and Liabilities for Aldrich Pump LLC Case No. 20-30608 (ECF No. 207); Schedules of Assets and Liabilities for Murray Boiler LLC Case No. 20-30609 (ECF No. 19).

As of December 31, 2019, IR plc itself projected the current and future asbestos liabilities of Ingersoll-Rand and Old Trane to be at least $547 million.

36.    While defending and settling asbestos lawsuits, Ingersoll-Rand and Old Trane used insurance proceeds, including those received under settlements or certain "coverage-in-place" agreements, to fund or offset the defense and indemnity costs of their asbestos liabilities. IR plc tracked the net annual "earnings" and "losses" related to asbestos liabilities by totaling the asbestos insurance receivables in a given year and subtracting the amounts it paid in asbestos defense and indemnity costs. According to this metric, IR plc suffered net losses related to resolving asbestos claims of $11.9 million in 2017 and $56.5 million in 2018. However, in 2019, settlements were reached with several insurance carriers related to asbestos claims. As a result, in 2019, IR plc saw net *earnings* of over $68 million related to asbestos liabilities.

37.    Despite this substantial cash infusion from insurance recoveries and paying all of its liabilities as they became due, the Trane Organization knew there would be continuing asbestos liabilities, and IR plc projected that asbestos liabilities would substantially exceed probable future insurance recoveries. In fact, at the end of 2019, IR plc projected that the current and future asbestos liabilities of Ingersoll-Rand and Old Trane would surpass their total projected insurance recoveries by almost $240 million.

38.    In an attempt to reduce or forestall such payments to current and future asbestos claimants (and even to eliminate them entirely as to some asbestos claimants) and curtail the rights of claimants, Defendants, their directors and officers, and their professionals devised and implemented a scheme to "restructure" Ingersoll-Rand and Old Trane. The scheme included using the bankruptcy process to delay, eliminate, or reduce Ingersoll-Rand's and Old Trane's asbestos liabilities, all to the detriment of the victims and their rights to pursue and/or recover on account

of such claims, including recovery in full on claims available to asbestos claimants under applicable non-bankruptcy law.

### C.     The "Reverse Morris Trust" Transaction

39.     Although fully able to satisfy its obligations to those individuals who contracted mesothelioma and other asbestos-induced cancers, IR plc decided to engage in a series of corporate transactions intended to end the Trane Organization's continuing involvement in asbestos personal-injury lawsuits and to shield assets from asbestos claimants.

40.     The first step took place prior to the Corporate Restructuring described more fully below and involved IR plc spinning off its valuable industrial division to Gardner Denver Inc. ("Gardner Denver") through a tax-free transfer of assets known as a "Reverse Morris Trust" transaction (the "RMT Transaction").  The RMT Transaction was signed on April 30, 2019, and closed on February 29, 2020, with Gardner Denver providing $1.9 billion in cash and $6.9 billion in Gardner Denver stock to Ingersoll-Rand in exchange for the industrial division.  As part of the RMT Transaction, Ingersoll-Rand transferred to Gardner Denver two businesses with legacy asbestos liabilities, ████████████████████████  but retained the asbestos liabilities arising from those businesses.

41.     Upon the closing of the RMT Transaction, Ingersoll-Rand distributed the Gardner Denver stock to its ultimate parent, IR plc, giving IR plc a controlling equity interest in Gardner Denver.  The effect was to separate businesses that resulted in nearly $7 billion of cash from the asbestos liabilities that were related to those businesses.  IR plc and its shareholders ended up owning 50.1% of Gardner Denver while the former shareholders of Gardner Denver kept the remaining 49.9% of shares in Gardner Denver.

42.     On March 1, 2020, Gardner Denver changed its name to Ingersoll-Rand Inc., and

IR plc changed its name to Trane Technologies plc ("Trane plc").

## II.    PROJECT OMEGA: THE SCHEME BEHIND THE CORPORATE RESTRUCTRING

43.    The second phase of the scheme to end the Trane Organization's involvement in asbestos personal-injury lawsuits and to shield assets from asbestos claimants employed a series of carefully planned and executed transactions, referred to herein as the "Corporate Restructuring," that included the formation of the Debtors, Aldrich and Murray; the chapter 11 filings; and related Preliminary Injunction Adversary Proceeding.  The principal participants involved in the decisions by Ingersoll-Rand and Old Trane to engage in the Corporate Restructuring included, among others, David Regnery, Ray Pittard, and Christopher Kuehn, each of whom held various positions at Defendants and/or their affiliates.  Ingersoll-Rand and Old Trane stated that they engaged in the Corporate Restructuring "[t]o facilitate their ability to respond to the asbestos claims against them, including through a potential section 524(g) resolution" in bankruptcy "without subjecting their entire enterprises to chapter 11."[11]

44.    The planning and implementation of the Corporate Restructuring was done in secret and within Ingersoll-Rand and Old Trane bore the codename "Project Omega."  The project was named "Omega" by ███████████████████████████████████████████████████ ███████████████████████████.  The genesis of Project Omega has been attributed to the general counsel of Ingersoll-Rand, Evan Turtz, who is currently general counsel of Trane plc, the Debtors' ultimate parent holding company.  After Mr. Turtz became Ingersoll-Rand's general counsel on April 4, 2019, he received and read a brief filed in *Bestwall*, another currently pending asbestos chapter 11 case.  Mr. Turtz thought a bankruptcy resolution for the asbestos claims against

---

[11] Informational Brief of Aldrich Pump LLC and Murray Boiler LLC, *In re Aldrich Pump LLC*, No. 20-30608 (JCW) (Bankr. W.D.N.C. June 18, 2020) (ECF No. 5) at 33, 34-35.

Ingersoll-Rand and Old Trane "would potentially be interesting." Shortly thereafter, in the spring of 2019, Mr. Turtz contacted outside bankruptcy counsel to assist with the project, and Project Omega was launched beginning around June of 2019. Thus, from its inception, Project Omega was an attorney-created and implemented strategy.

45. Ingersoll-Rand, Old Trane and their affiliates began taking steps to prepare for the planned bankruptcy prior to June 2019, when outside bankruptcy counsel had been previously retained by the Trane Organization.

46. Project Omega was a highly secretive endeavor. It was not openly discussed or otherwise disclosed by the company, and the vast majority of employees within the Trane Organization were not even aware of the Corporate Restructuring until it had already occurred.

47. Before employees could work on Project Omega, they were required to sign nondisclosure agreements to keep the project under a veil of secrecy, even within the Trane Organization.

48. The number of employees privy to Project Omega was initially limited and relatively small—initially as few as seven people, four of whom were in-house counsel—but grew as Project Omega took shape and required the involvement of additional personnel. This secrecy appears to have been driven not just by company protocol, but to hide the scheme to isolate asbestos liabilities from asbestos claimants until completed, as internal communications before the Corporate Restructuring described "███████████████████████████████████████████████████████████."

49. Although knowledge of the project was kept to a relatively small number of employees, Project Omega had the attention and involvement of executives at the highest levels of the organization, including the chief executive officer of IR plc (now Trane plc), Michael

Lamach.

50.    As time progressed, meetings among Project Omega team members took place with increasing frequency and included weekly "all hands" team meetings chaired by then-IR plc's general counsel, Mr. Turtz (now, Trane plc's general counsel).  At most or all of these meetings, both in-house lawyers and outside counsel were present, regardless of subject matter.  Indeed, the close and almost ubiquitous involvement of attorneys in Project Omega underscores how Project Omega was driven not by business people, but by lawyers, and was part of the scheme to try to cloak the conversations regarding Project Omega in privilege in connection with efforts to maintain the veil of secrecy of the divisional mergers and plans for bankruptcy.

51.    In connection with the planning and implementation of the Corporate Restructuring, Project Omega team members were instructed to pay careful attention to prior divisional merger cases commenced by the Debtors' bankruptcy counsel—namely, the *Bestwall*, and *DBMP* bankruptcy cases, and to become familiar with *In re Garlock Sealing Technologies LLC*, No. 10-31607 (Bankr. W.D.N.C.) ("*Garlock*").  Indeed, ███████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████

52.    Project Omega was launched to address the asbestos liabilities of Ingersoll-Rand and Old Trane.  Although board meeting minutes and individuals within the Trane Organization claim that the bankruptcy filings by Aldrich and Murray that would occur after completion of the Corporate Restructuring were just one of four "options" under consideration to deal with the asbestos liabilities, documents—or at least the documents that were not authored or edited by counsel and thus withheld under claims of privilege—and testimonial evidence show that bankruptcy and pursuit of a section 524(g) trust was not just *an* "option" but rather the *only*

"option" being pursued and the sole objective of Project Omega.

53.     For example:

a.      Mr. Turtz has stated that he was not aware of any Project Omega "workflow stream document" pertaining to any non-bankruptcy "options."

b.      Project Omega team members expected and planned for a long-term bankruptcy prior to the Corporate Restructuring, which they estimated would last for five or more years.

c.      An internal document entitled ███████████████ explicitly states as of ██████████████████████████████████████████████ ████████████████████████.

d.      Prior to the Petition Date, Aldrich and Murray were regularly referred to in Project Omega documents as ████████████████████████.

e.      Prior to the Corporate Restructuring, Project Omega team members discussed Project Omega ████████████████████████████████ and the timing of the ████████████.

f.      A Project Omega team member emailed others stating that she "hit the data/information jackpot" when locating the website containing the *Bestwall* chapter 11 case filings.  Project Omega team members also circulated standard bankruptcy forms to one another that would have to be completed and filed after the chapter 11 filings.

g.      Long before the Petition Date, Project Omega team members explicitly discussed plans to merge the Debtors' operating subsidiaries, 200 Park and ClimateLabs, back into New TTC and New Trane after the Debtors' bankruptcies

concluded.

54.    Ultimately, the boards of Ingersoll-Rand and Old Trane determined to move forward with the Corporate Restructuring.  This was effectuated betwee April 30, 2020 and May 1, 2020 through a series of transactions, discussed more fully below, including two divisional mergers purportedly in compliance with Chapter 10, Subchapter A of the Texas Business Organization Code—a key component of Project Omega that was needed to effectuate the bankruptcies.  As set forth below, the divisional mergers solely intended to obtain a clean isolation of asbestos liabilities from assets and non-asbestos liabilities.

55.    The entire purpose of the Corporate Restructuring and eventual bankruptcy filings was to reduce liabilities for the Trane Organization by staying all asbestos-related litigation and using estimation proceedings to obtain a final asbestos liability determination (which would be the obligation of two new entities—Aldrich and Murray—stripped of virtually all assets) for less than the tort system, at the expense of asbestos victims and their rights as they existed prior to the Corporate Restructuring.  That final liability bill, in turn, would be the responsibility of the newly created entities—Aldrich and Murray—which would be virtually bereft of assets.  At all relevant times, the purpose and intent of Project Omega was the splitting of the Ingersoll-Rand and Old Trane legal entities through the Corporate Restructuring so as to isolate the asbestos liabilities of the Trane Organization from its assets and to delay, eliminate, and/or reduce Ingersoll-Rand's and Old Trane's asbestos liability obligations to the detriment of the victims and their rights to recover on account of such claims.

## III.    IMPLEMENTING THE CORPORATE RESTRUCTURING

56.    After months of planning in secret the Corporate Restructuring and the intended chapter 11 filings, Ingersoll-Rand and Old Trane engaged in the planned series of transactions in

the spring of 2020 to carry out Defendants' scheme to isolate Ingersoll-Rand's and Old Trane's asbestos liabilities and delay indefinitely or eliminate entirely the process of dealing with asbestos claimants through the tort system. The transactions were intended to divide Ingersoll-Rand and Old Trane and establish two new entities saddled with all of their asbestos liabilities—the Debtors, Aldrich and Murray—and two other entities encompassing virtually all of their assets and non-asbestos liabilities—New TTC and New Trane.

### A. The Ingersoll-Rand/Old TTC Divisional Merger

57. After months of planning the Corporate Restructuring, on March 26, 2020, Ingersoll-Rand reserved the corporate name "Aldrich Pump LLC" in North Carolina.

58. On April 30, 2020, Ingersoll-Rand's then direct parent, Defendant IRGH, incorporated Defendant TT HoldCo in Delaware and contributed its stock in Ingersoll-Rand to TT HoldCo.

59. Also on April 30, 2020, Defendant TT HoldCo, in turn, formed Trane Technologies Company LLC ("Old TTC") as a Texas limited liability company.

60. The next day, May 1, 2020, at 9:00 a.m. (CT), Ingersoll-Rand, the holder of substantial asbestos liabilities, was merged into Old TTC, leaving Old TTC as the surviving entity. Old TTC thus became the successor by merger to Ingersoll-Rand.

61. That same day, May 1, 2020, at 10:00 a.m. (CT), Old TTC effected a divisional merger purportedly in compliance with Texas law, resulting in the dissolution of Old TTC and the formation of (i) Defendant New TTC and (ii) Aldrich as Texas limited liability companies wholly owned by Defendant TT HoldCo.

62. Under the Plan of Divisional Merger, New TTC received approximately 99% of Old TTC's assets, while the remaining 1% of the assets were allocated to Aldrich. Specifically,

Aldrich received $26.2 million in cash, all equity interests in a relatively small operating subsidiary known as 200 Park, Inc. ("200 Park"), and rights to Ingersoll-Rand's asbestos-related insurance coverage. No operating business was received by Aldrich apart from its equity interest in the 200 Park subsidiary.

63.     Against these inadequate assets, the Corporate Restructuring purported to allocate all of Ingersoll-Rand's asbestos liabilities to Aldrich and also purported to obligate Aldrich to indemnify New TTC and all other non-debtor affiliates against, and hold them harmless from, "all Losses" related to those liabilities, including future losses due to asbestos liabilities of New Trane and its other non-debtor affiliates.

64.     Later that same day, May 1, 2020, at 11:00 a.m. (CT), New TTC converted to a Delaware limited liability company, and Aldrich converted to a North Carolina limited liability company. As a result of these rapid corporate transactions, New TTC and Aldrich were Texas entities for less than 24 hours.

65.     The following table summarizes the organizational structure before and after the Corporate Restructuring:

Table 1



66.     Since the completion of the Corporate Restructuring, New TTC, as part of the overall Trane Organization, has continued with the business operations once conducted by

Ingersoll-Rand.  New TTC also continues to pay its non-asbestos creditors in the ordinary course of business.

67.     In contrast to New TTC, Aldrich does not have any employees or ongoing business operations and has few assets.  As a result of the divisional merger, Aldrich was rendered insolvent, with no ability on its own to meet its existing liabilities to asbestos victims.  Indeed, its only potentially relevant asset was an agreement, which is discussed below, in which New TTC agreed to pay Aldrich's liabilities under limited circumstances.  In other words, Aldrich was created to file for bankruptcy and yet remain entirely beholden to Defendants, who hold all the assets (and therefore all of the cards) with respect to any recovery for asbestos victims.

### B.     The Old Trane Divisional Merger

68.     Following nearly the same process and timeline as the Ingersoll-Rand/Old TTC divisional merger outlined above, Old Trane also effectuated a divisional merger.  On April 30, 2020, Old Trane formed ClimateLabs LLC ("ClimateLabs") as a North Carolina limited liability company and Defendant Murray Holdings as a Delaware limited liability company.  In addition, Old Trane's direct parent, Defendant Trane Inc., formed Defendant TUI Holdings as a Delaware corporation and contributed its stock in Old Trane to TUI Holdings.

69.     The next day, May 1, 2020, at 9:00 a.m. (CT), Old Trane converted from a Delaware corporation to a Texas corporation.  The same day, at 10:00 a.m. (CT), Old Trane effected a divisional merger purportedly in compliance with Texas law, resulting in the dissolution of Old Trane and the formation of (i) Defendant New Trane as a Texas corporation and (ii) Murray as a Texas limited liability company.  As a result, Murray became a wholly-owned subsidiary of Defendant Murray Holdings, which in turn is wholly owned by Defendant New Trane—a wholly-owned subsidiary of Defendant TUI Holdings.

70.      Under the plan of divisional merger, New Trane received approximately 98% of Old Trane's assets, while the remaining 2% of the assets were allocated to Murray.  Specifically, Murray received $16.1 million in cash, all equity interests in ClimateLabs, and rights to Old Trane's asbestos-related insurance coverage.  No operating business was received by Murray apart from the ClimateLabs subsidiary.

71.      Against these inadequate assets, the Corporate Restructuring purported to allocate all of Old Trane's asbestos liabilities to Murray and also purported to obligate Murray to indemnify New Trane and all other non-debtor affiliates against, and hold them harmless from, "all Losses" related to those liabilities, including future losses due to asbestos liabilities of New Trane and its other non-debtor affiliates.

72.      Later that same day, May 1, 2020, at 11:00 a.m. (CT), New Trane converted to a Delaware corporation, and Murray converted to a North Carolina limited liability company.  As a result of these rapid corporate transactions, New Trane and Murray were Texas entities for less than 24 hours.

73.      The following table summarizes the organizational structure before and after the Corporate Restructuring:

Table 2



74.   Since the completion of the Corporate Restructuring, New Trane, as part of the overall Trane Organization, continued with the business operations once conducted by Old Trane. New Trane also continues to pay its non-asbestos creditors in the ordinary course of business.

75.   In contrast to New Trane, Murray does not have any employees or ongoing business operations and has few assets.  As a result of the divisional merger, Murray was rendered insolvent, with no ability on its own to meet its existing and future liabilities to asbestos victims.  Indeed, its only potentially relevant asset was an agreement, which is discussed below, in which New Trane agreed to pay Murray's liabilities under limited circumstances.  In other words, Murray was created to file for bankruptcy and yet remain entirely beholden to Defendants, who hold all the assets (and therefore all of the cards) with respect to any recovery for asbestos victims.

76.   Thus, as a result of the Ingersoll-Rand/Old TTC and Old Trane divisional mergers (collectively, the "Divisional Mergers") summarized above, in a matter of hours and without notice to any of their asbestos creditors, Ingersoll-Rand and Old Trane separated virtually all of their business operations, assets, and employees from their asbestos liabilities, transferring those

liabilities to Debtors Aldrich and Murray.  This enabled Ingersoll-Rand and Old Trane to achieve their goal of placing their asbestos liabilities in bankruptcy without the entire Trane Organization filing for chapter 11.

## IV.    INTERCOMPANY AGREEMENTS

77.    As part of the implementation of the Corporate Restructuring, Debtors, New TTC, New Trane, and various non-debtor affiliates entered into several agreements, all of which were dated "as of" April 30, 2020 or May 1, 2020, the two days on which the Trane Organization executed the Divisional Mergers.

78.    All of these agreements were between affiliated companies, and thus were not the result of any arm's length negotiation over their terms.  Indeed, Alan Tananbaum, Chief Legal Officer and Secretary at Aldrich and Murray and a Finance Director-Information Technology & Legal at New TTC, has acknowledged that there were no arm's length negotiations with respect to the agreements.  In addition, individuals who authorized the execution of or signed the agreements have acknowledged that they had no understanding at the time of what they were signing.

79.    Moreover, the agreements involving Aldrich and Murray were not even negotiated by them; rather, they were drafted by outside counsel to the Trane Organization (and now counsel to the Debtors) prior to the Corporate Restructuring and bankruptcies, belying any notion that Aldrich's and Murray's bankruptcies were merely an option considered by the prepetition Debtors; instead, Aldrich and Murray were always intended to be debtors as part of a pre-ordained essential component of Project Omega.  First in Texas, and subsequently in North Carolina, the Debtors' boards of managers executed unanimous consents to approve the intercompany agreements, including the Funding Agreements, the Support Agreements, and the Secondment Agreements (all

defined below).   These agreements were all previously drafted and approved without any real

substantive amendments or modifications at the time the Debtors first executed them.

80.    Taken together, the agreements make clear that Aldrich and Murray lack the basic

characteristics of independent corporate entities and were created purely to enable the Trane

Organization to eliminate or seek to reduce the corporate family's obligations to present and future

asbestos victims and hinder, delay, or defraud them of their ability to obtain recoveries on their

claims.

81.    The most relevant agreements are described below.

**A.    The Funding Agreements**

82.    There are two funding agreements at issue: (i) one entered into by New TTC (as

payor) and Aldrich (as payee) (the "Aldrich Funding Agreement"); and (ii) one entered into by

New Trane (as payor) and Murray (as payee) (the "Murray Funding Agreement," and together

with the Aldrich Funding Agreement, the "Funding Agreements").

83.    The Aldrich Funding Agreement was initially entered into on May 1, 2020 by

██████████████████████████████████████████████████████████████████

████████████████████████████████████  Immediately following the divisional merger, ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████.  Also on May 1, 2020, following the Aldrich

divisional merger, the Aldrich Funding Agreement was amended and restated to ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████. The Aldrich Funding Agreement was later

amended and restated a second time as of June 15, 2020.

84.     The Murray Funding Agreement was initially entered into on May 1, 2020 by

██████████████████████████████████████████████████████

████████████████████. Immediately following the divisional merger, ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████. Also on May 1, 2020, following the Murray

divisional merger, the Murray Funding Agreement was amended and restated to ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████. The Murray Funding Agreement was later amended

and restated a second time as of June 15, 2020.

85.     The Funding Agreements provide, among other things, that New TTC and New

Trane will transfer funds to Aldrich and Murray, respectively, to pay any "Permitted Funding Use."

The term "Permitted Funding Use" includes (i) the costs of administering the Debtors' chapter 11

cases, (ii) amounts necessary to satisfy each Debtor's "Asbestos Related Liabilities" in connection

with funding a § 524(g) trust, and (iii) the Debtors' indemnification obligations to New TTC, New

Trane, and the other non-debtor affiliates under any agreement provided for in the plans of

divisional mergers that governed the Divisional Mergers.

86.     Under the Funding Agreements, New TTC and New Trane are obligated to pay the

chapter 11 administrative expenses and Debtors' indemnification obligations only if the cash

distributions from 200 Park (in the case of Aldrich) or ClimateLabs (in the case of Murray) are insufficient to pay those expenses and obligations in full.  In addition, New TTC and New Trane are each obligated to fund a § 524(g) trust only if their respective Debtor's "other assets are insufficient to fund amounts necessary or appropriate to satisfy . . . Asbestos Related Liabilities in connection with the funding of such trust."

87.    The Funding Agreements[12] are plagued by numerous flaws.  First, the Funding Agreements are not unconditional promises to pay all of Aldrich's and Murray's asbestos liabilities.  New TTC's and New Trane's obligations under their respective Funding Agreements do not extend to the other non-debtor affiliates that are beneficiaries of the Support Agreements, which are discussed below.

88.    Second, the Funding Agreements were made between related parties—New TTC and Aldrich, and New Trane and Murray—and their terms were specifically dictated by Ingersoll-Rand and Old Trane in designing the agreements before Aldrich and Murray even existed (and, thus, Aldrich and Murray could not have had a say as to their terms).  Asbestos victims were not consulted with regard to the terms of the Funding Agreements, nor did New TTC, New Trane, Aldrich, or Murray make any effort to negotiate the agreements given that as noted above, the companies did not exist when these "agreements" were first drafted.

89.    Third, only the Debtors are permitted to enforce the terms of the Funding Agreements, notwithstanding the fact that their provisions were ostensibly intended to inure to the benefit of third-party asbestos victims.  Given that all of Aldrich's and Murray's employees are

---

[12] For clarity, the relevant Funding Agreements for purposes of this Complaint and Plaintiff's claims are the Funding Agreements in effect at the time of the Corporate Restructuring, the May 1, 2020, Amended and Restated Funding Agreements.  *See* DEBTORS_00003256 (Amended and Restated Funding Agreement between Trane Technologies Company LLC (DE) (New TTC) and Aldrich Pump LLC (NC), dated as of May 1, 2020); DEBTORS_00001582 (Amended and Restated Funding Agreement between Trane U.S. Inc. (New Trane) and Murray Boiler LLC, dated as of May 1, 2020).

seconded employees of New TTC, they are hardly likely to ever take any action contrary to New TTC's and the other Defendants' wishes, including enforcing the Funding Agreements on behalf of the Debtors against New TTC and New Trane.

90.     Fourth, the Funding Agreements do not prevent New TTC and New Trane from layering on debt that would be senior in priority to their obligations to the Debtors under the Funding Agreements.

91.     Fifth, nothing in the Funding Agreements requires New TTC and New Trane to provide financial statements to the Debtors that are audited or contain information at a level that provides details on account balances and material transactions (*e.g.*, footnotes to financial statements).

92.     Sixth, New TTC and New Trane are not required to provide payments that "exceed the aggregate amount necessary" for the Debtors to fund all "Permitted Funding Uses," thus giving New TTC and New Trane unfettered discretion to determine what is "necessary" and the ability to reduce payments if either disagrees with the use of funds.

93.     Seventh, the Funding Agreements provide no dispute resolution mechanism if a funding request by a Debtor is denied.

94.     Eighth, the Funding Agreements do not prevent New TTC and New Trane from engaging in additional divisional mergers, and they explicitly allow New TTC and New Trane to engage in consolidations and mergers, and to transfer "all or substantially all" of their assets, which would leave Aldrich and Murray (and their creditors) with no source of recovery under the Funding Agreements.

95.     Ninth, there are no mechanisms in the Funding Agreements to ensure that New TTC and New Trane will have sufficient assets to perform under them.

96.     Tenth, nothing in the Funding Agreements limits or prohibits dividends, or other distributions of value, by New TTC or New Trane to equity holders, potentially including their full value.

97.     Eleventh, the Debtors' rights under their respective Funding Agreements may not be assigned without the prior written consent of New TTC (in the case of the Aldrich Funding Agreement) or New Trane (in the case of the Murray Funding Agreement).  Therefore, the Funding Agreements could not be assigned to a trust under a creditor plan and that plan could not be funded unless New TTC and/or New Trane approve of that plan.

98.     Twelfth, and most importantly, the Funding Agreements require, as a precondition to funding a section 524(g) trust, that a confirmed chapter 11 plan provide New TTC or New Trane, as applicable, "with all the protections of section 524(g) of the Bankruptcy Code."

99.     And finally, the Funding Agreements have "Automatic Termination" provisions (added in the June 15, 2020 amendments and restatements) whereby New TTC's and New Trane's respective funding obligations automatically cease "on the effective date of a Section 524(g) Plan." This means that the Funding Agreements could never serve as post-effective-date "evergreen" sources of funding that section 524(g) contemplates.  The combination of this provision along with the anti-assignment provision and the provision requiring that a confirmed chapter 11 plan provide New TTC or New Trane with all the protections of section 524(g), impair, if not effectively disable, the Committee's ability and right, once exclusivity expires or is terminated, to propose a competing section 524(g) plan that would rely on the Funding Agreements as part of the means of implementing such plan.  In short, although the Funding Agreements may provide funding for a plan, they will do so only if New TTC and New Trane favor that plan, and that favor is dependent on these entities receiving permanent injunctive relief from the Aldrich and Murray asbestos

claims—whether they are entitled to it or not.

100.     As a result of the Corporate Restructuring, including the bankruptcies, asbestos creditors—who, prior to the Corporate Restructuring, would have the ability to enforce judgments against all of Ingersoll-Rand's and Old Trane's assets—were stripped of their ability to lay direct claim to New TTC's and New Trane's assets and were instead made dependent on the willingness of Aldrich's and Murray's conflicted personnel to press Aldrich's and Murray's rights under their respective Funding Agreement for the benefit of asbestos creditors and to the detriment of Aldrich's and Murray's corporate parents and related entities.  Aldrich and Murray lack the ability on their own to pay asbestos claims for which they assumed responsibility as part of the Corporate Restructuring.

101.     It is indisputable that, despite the limited, flawed, and contingent rights provided by the Funding Agreements, Aldrich and Murray were rendered insolvent as a result of the Corporate Restructuring.  The Funding Agreements do not provide any funding for recoveries to asbestos claimants unless New TTC or New Trane agree to provide such funding and, of course, New TTC and/or New Trane control the beneficiaries of the Funding Agreements.  The restrictions on transferability, conditions and limitation on funding and uncertainties of collectability together greatly diminish the supposed value of the Funding Agreements.  As a result, the Funding Agreements are of little value to asbestos claimants, and Aldrich and Murray were rendered insolvent as a result of the Corporate Restructuring.  Moreover, because the Funding Agreements at best provide recoveries for expenses related to Aldrich's and Murray's bankruptcies and, under the limited circumstances set forth herein, for asbestos victims, the Funding Agreements do not provide Aldrich and Murray with reasonably equivalent value to the obligations that were allocated to and assumed by Aldrich and Murray in the Corporate Restructuring.

**B.      The Support Agreements**

102.    As part of the divisional mergers, the Debtors and New TTC and New Trane entered into (i) the Divisional Merger Support Agreement between New TTC and Aldrich (the "Aldrich Support Agreement"); and (ii) the Divisional Merger Support Agreement between New Trane and Murray (the "Murray Support Agreement," and, together with the Aldrich Support Agreement, the "Support Agreements").  The Support Agreements were entered into as of May 1, 2020, and later that same day were subsequently amended and restated following ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████.

103.    Among other things, the Aldrich Support Agreement requires Aldrich to

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████[13]

104.    The Murray Support Agreement has a nearly identical provision requiring it to

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████[14]

105.    Having been assigned all of Ingersoll-Rand's asbestos liabilities through the Corporate Restructuring and only 1% of all assets of Ingersoll-Rand, Aldrich has no independent ability to honor its indemnification obligations to New TTC.

106.    Similarly, having been assigned all of Old Trane's asbestos liabilities through the Corporate Restructuring and only 2% of all assets of Old Trane, Murray has no independent ability

---

[13] ██████████████████████████████████████████

[14] ██████████████████████████████████████████

to honor its indemnification obligations to New Trane.

107.    Entry into the Support Agreements combined with having been allocated all of Defendants' pending asbestos claims immediately rendered Aldrich and Murray insolvent. As set forth above, among other things, the Funding Agreements provide funding to Aldrich and Murray for these asbestos liabilities only if there is a section 524(g) plan that provides all Trane Organization entities with protection from all asbestos liabilities. As a result, the Funding Agreements do not come close to satisfying the liabilities assumed by Aldrich and Murray.

108.    Making matters worse, these payments could be funded with money borrowed from the new sibling (in the case of Aldrich) or parent (in the case of Murray). If the cash distributions from 200 Park are insufficient to allow Aldrich to pay its indemnification obligations to New TTC and its affiliates, the Aldrich Funding Agreement provides that New TTC will provide the funds to Aldrich so that Aldrich, in turn, may indemnify New TTC or any other affiliate. A substantially similar provision is contained in the Murray Funding Agreement that enables Murray, in the event of insufficient cash distributions from ClimateLabs, to receive funding from New Trane so that Murray may, in turn, indemnify New Trane and any other affiliate. In other words, the Support Agreements' indemnity provisions, when coupled with the Funding Agreements, create, at best, a potential circular transfer of funds between the Debtors and New TTC/New Trane.

C.      **The Secondment Agreements**

109.    Intending that Aldrich and Murray would have no employees of their own, Ingersoll-Rand and Old Trane created a "Secondment Agreement" between the as yet to be formed Aldrich, Murray, and New TTC, whereby ████████████████████████████████████ ████████████████████████████████████████. █████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████████████████

## V.   THE DIVISIONAL MERGERS AND THE INTERCOMPANY
### AGREEMENTS VIOLATED APPLICABLE LAW

110.   The Corporate Restructuring and the various agreements described above that were executed in connection with the Corporate Restructuring violated applicable law including, without limitation, applicable fraudulent transfer laws and provisions of the Texas Business Organizations Code (the "TBOC").  Under the TBOC, a plan of divisional merger must include "the manner and basis of allocating each liability and obligation of each organization that is a party to the merger . . . among one or more of the surviving or new organizations."  TBOC § 10.0001. When the divisional merger takes effect "all liabilities and obligations of each organization that is a party to the merger are allocated to one or more of the surviving or new organizations in the manner provided by the plan of merger."  *Id*. § 10.008(a).  Although Texas law allows for the allocation of liabilities to the surviving entities, such allocation cannot "abridge any right or rights of any creditor under existing laws."  *Id*. § 10.901.

111.   Because the plans of divisional merger and the various intercompany agreements described above have a material adverse effect on the rights of asbestos victims as creditors, the Divisional Mergers and the various intercompany agreements entered into in connection with the Divisional Mergers are in violation of TBOC § 10.901.  The Texas divisional merger statute does not enable an entity to abridge rights against the predecessor entity, which in this case is Ingersoll-Rand/Old TTC and Old Trane.  In addition, the Texas divisional merger statute does not permit New TTC and New Trane to divest themselves of their obligations to asbestos victims.

112.   Prior to the Corporate Restructuring, Ingersoll-Rand/Old TTC and Old Trane and their affiliated entities were defendants in many thousands of asbestos-related actions and used the assets available at Ingersoll-Rand/Old TTC and Old Trane to pay obligations arising out of those

actions as and when such debts came due.  However, beginning in 2019 and continuing into the spring of 2020, Defendants conceived of and implemented the Corporate Restructuring, which contemplated and eventually resulted in the bankruptcy filings of two entities with only limited assets and to which all existing and future asbestos-related claims against Ingersoll-Rand/Old TTC and Old Trane had been assigned.  The purpose of these corporate machinations was to curtail the rights of existing and future asbestos claimants to directly pursue and recover the full extent of their claims.  The transfers occurring as a result of the Corporate Restructuring were effectuated by and among insiders, including Defendants, among others.

113.    The Corporate Restructuring was purportedly effectuated pursuant to the Divisional Mergers under the TBOC.  However, Divisional Mergers cannot "abridge any right or rights of any creditor under existing laws."  TBOC § 10.901.  In this manner, the Corporate Restructuring and resulting Aldrich and Murray bankruptcies abridged the rights of Ingersoll-Rand/Old TTC's and Old Trane's asbestos claimants, thereby violating TBOC § 10.901.

## VI.    POST-CORPORATE RESTRUCTURING RUN-UP TO CHAPTER 11 FILING

### A.    Trane Organization Insiders Associated with the Debtors

114.    Following the completion of the two Divisional Mergers, the Debtors' officers and boards of managers ensured that Aldrich and Murray would complete the scheme embarked on by the Trane Organization and file for bankruptcy.  To ensure that the scheme was completed, current and former executives and employees within the Trane Organization were hand-selected and strategically positioned by Trane plc's senior leadership (including Mr. Turtz) to hold board and/or officer positions with the Debtors, while maintaining their high-level positions within the Trane Organization.  These very same individuals were also intimately involved with Project Omega and continued to attend Project Omega meetings notwithstanding their appointed roles with the

Debtors, and thus ensured that Aldrich and Murray would complete the scheme embarked on by the Trane Organization and file for bankruptcy.

115.    For example, Aldrich's Board of Managers (the "Aldrich Board") consists of Manlio Valdes (who also serves as President of the Debtors and is also a director and President of 200 Park and Climate Labs, and Vice President Project Management, The Americas, Trane Commercial HVAC, at New TTC), Amy Roeder (who also serves as Chief Financial Officer and Treasurer of the Debtors; is a director and Chief Financial Officer of the Debtors' subsidiaries, 200 Park and ClimateLabs; and is also the Finance-Director—Information Technology & Legal at both New TTC and New Trane), and Robert Zafari.  Murray's Board of Managers (the "Murray Board" and, together with the Aldrich Board, the "Debtor Boards") consists of Mr. Valdes, Ms. Roeder, and Marc Dufour.  As noted above, Ms. Roeder and Mr. Valdes are employed by non-debtor affiliates within the Trane Organization.  Although neither Mr. Zafari nor Mr. Dufour is currently employed by an entity within the Trane Organization, each is a retired employee of an entity within the Trane Organization.

116.    In addition, for both Debtors, Mr. Tananbaum serves as Chief Legal Officer and Secretary (while also serving as Deputy General Counsel-Product Litigation at New TTC), and Mr. Pittard serves as Vice President and Chief Restructuring Officer (while also serving as Transformation Office Leader at Trane plc).  Moreover, in addition to being an in-house attorney seconded to the Debtors, Mr. Sands holds the position of associate general counsel for product litigation at New TTC.

117.    Aldrich and Murray board meetings to authorize the filing of Aldrich's and Murray's bankruptcies were attended by Ingersoll-Rand's and Old Trane's outside counsel, which is now Aldrich's and Murray's bankruptcy counsel, and officers wearing multiple, conflicting hats

for both the Debtors and other entities within the Trane Organization, including Messrs.

Tananbaum, Pittard, and Turtz, and Ms. Brown, among others.

118.    Most if not all of these individuals were aware of and involved in Project Omega

from the outset.  For example, Ms. Roeder was involved in and very knowledgeable about Project

Omega from at or near its inception—███████████████████████████ — and attended

Project Omega meetings since July 2019.  Similarly, Mr. Valdes was actively involved with Project

Omega and received confidential project updates as early as December 2019, and was selected to

work for the Debtors because of his high position within the Trane Organization.  Mr. Tananbaum

was involved in Project Omega meetings and project planning as early as July 2019.  Similarly,

Mr. Pittard can also be traced to early Project Omega planning.  In addition, the Debtors continue

to receive various corporate services (and the services of their other officers) through services

agreements with New TTC.

**B.      The Eventual Filings of Aldrich's and Murray's Bankruptcy Petitions Were
the Only Reasons Ingersoll-Rand/Old TTC and Old Trane Engaged in the
Corporate Restructuring and Were an Integral Part of the Defendants'
Scheme to Hinder, Delay, and Defraud Asbestos Creditors**

119.    Aldrich's and Murray's filings of bankruptcy petitions were an integral part of the

Defendants' scheme to hinder, delay, or defraud asbestos creditors and curtail their rights to

recover on the full extent of their claims.  The Corporate Restructuring was specifically designed

and implemented to effectuate bankruptcy filings that would solely impact holders of asbestos-

related personal injury claims caused by exposure to Ingersoll-Rand's and Old Trane's asbestos-

containing products without necessitating the filing of the entire Trane Organization, thereby

attempting to shield the assets apportioned to New TTC and New Trane from asbestos creditors

while not subjecting those assets, or the claims of any other creditors of the go-forward Trane

Organization, to Bankruptcy Court oversight.

120.    The intended purpose of the bankruptcies was and is to deprive claimants of their rights to due process and a jury trial, and attempt to reduce or eliminate the Trane Organization's liability to untold numbers of current and future asbestos personal injury claimants.  Defendants intended to use the bankruptcy process to hinder and delay recoveries to asbestos creditors and abridge their rights to recover on the full extent of their claims.

121.    In the 49 days between their formation on May 1, 2020 and their chapter 11 filings on June 18, 2020, the Debtor Boards met nine times (five joint meetings and two separate meetings for each board), purportedly to consider "options" to address the asbestos liabilities.

122.    As with the Project Omega meetings prior to the Corporate Restructuring, lawyers attended and drove the deliberations of each Debtor's board of managers.  Mr. Tananbaum, the Debtors' chief legal officer, chaired all board meetings even though he was not formally a member of either board.  Board meetings were also attended by other in-house attorneys as well as outside counsel.  ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ The minutes of the board meetings were initially drafted by outside counsel and then reviewed and edited, when necessary, by Mr. Tananbaum.  As with the Project Omega meetings, the extensive presence of counsel at board meetings has given the Debtors a platform for cloaking their board "deliberations" under a veil of privilege.

123.    Defendants maintain that the central issue facing the Debtor Boards was determining how best to address the Debtors' asbestos liabilities, including both the tens of thousands of pending claims against the companies and the future claims expected to be filed over the next three decades or more.  As such, Defendants claim that, starting with their joint meeting on May 15, 2020, the Debtor Boards were presented with and proceeded to consider four "options"

to address these asbestos liabilities:

i)      "Status quo" approach where Aldrich and Murray would continue to defend the
        Aldrich and Murray asbestos claims in the tort system;

ii)     "Structural optimization" strategy entailing additional corporate reorganization
        intended to optimize the ability to manage asbestos liabilities;

iii)    The purchase of an insurance product that would vest in a third party the
        responsibility for addressing the Aldrich and Murray asbestos claims; and

iv)     Chapter 11 bankruptcy filings by Aldrich and Murray with the goal of establishing
        and funding a section 524(g) trust.

124.    Although Defendants claim that, over the course of several meetings, the Debtor
Boards evaluated these four options and independently reached a decision to file the bankruptcy
petitions only on the evening of June 17, 2020, the night before the Debtors filed for bankruptcy,
these claims are entirely unsupported by evidence, which makes clear that as bankruptcy was
always the only option and thus a foregone conclusion.

125.    For example, Mr. Turtz has stated that he was not aware of any Project Omega
"workflow stream document" pertaining to any non-bankruptcy "options."

126.    Project Omega team members expected and planned for a long-term bankruptcy
prior to the Corporate Restructuring, one which they estimated would last for five or more years.
Amy Roeder circulated to other Project Omega team members standard bankruptcy forms that
would have to be completed and filed after the chapter 11 filings.  And long before the Petition
Date, Project Omega team members explicitly discussed plans to merge the Debtors' operating
subsidiaries, 200 Park and ClimateLabs, back into New TTC and New Trane after the Debtors'
bankruptcies concluded.

127.     The Aldrich and Murray board meeting minutes similarly display serious consideration only of bankruptcy, with all affirmative steps leading to the Debtors' eventual chapter 11 filings.  Indeed, the minutes of the Aldrich and Murray board meetings were used as a means of "creating" a "record" that the four options had been duly considered.

128.     For example, during the May 15, 2020 joint meeting of the Debtor Boards, "Mr. Tananbaum reviewed options available to the [Debtors] with respect to the resolution of current and future asbestos claims," with a special emphasis on "section 524(g) of Bankruptcy Code [*sic*]."[15]  By that date, Mr. Tananbaum had already made up his mind that he preferred bankruptcy over the other alleged alternatives.

129.     A week later, at the May 22, 2020 joint meeting of the Debtor Boards, Mr. Tananbaum and other lawyers led a discussion regarding the "mechanics and limitations" of the non-bankruptcy options.[16]

130.     Mr. Valdes, a member of both boards, has admitted that after the May 29, 2020 joint meeting of the Debtor Boards he thought it was "a probability" that the Trane entities would end up paying less to asbestos claimants in bankruptcy.

131.     On June 5, 2020, Mr. Tananbaum informed the Debtor Boards that, while they were not currently being asked to take any action, "he anticipated management of the [Debtors] would soon ask the Boards to authorize the [Debtors] to file chapter 11 bankruptcy and pursue final resolution of their current and future asbestos claims using 524(g) of the Bankruptcy Code."[17]

---

[15] May 15, 2020, Minutes of Joint Meeting of Boards of Managers at 4 (DEBTORS_00050787 at DEBTORS_00050790).

[16] May 22, 2020, Minutes of Joint Meeting of Boards of Managers at 4 (DEBTORS_00050791 at DEBTORS_00050794).

[17] June 5, 2020, Minutes of Joint Meeting of Boards of Managers at 4 (DEBTORS_00050802 at DEBTORS_00050805).

132. On June 17, 2020, the Aldrich and Murray boards unanimously approved resolutions authorizing the Debtors to file chapter 11.

133. Thus, the Debtor Boards' purported deliberations and resolutions fully support the conclusion that the Debtors' bankruptcy filings were a foregone conclusion from the start of Project Omega and not independent decisions by the Debtor Boards after actual consideration of genuine alternative options. Indeed, on May 27, 2020, Rolf Paeper, a Project Omega member, asked why the bankruptcy filings had been delayed because the Trane entities were "pushing to do that in less than 30 [*sic*] days…"[18] In response, Eric Hankins, another Project Omega member, wrote: "[W]e can't push, it has to be an independent [Board] decision."[19] Mr. Paeper replied, expressing his skepticism of each board's independence by putting the word "independant" [*sic*] in scare quotes.[20]

134. On June 18, 2020, a mere 49 days after the Corporate Restructuring was implemented, the Debtors filed their respective chapter 11 petitions in the United States Bankruptcy Court for the Western District of North Carolina.

135. As of the Petition Date, more than 100,000 asbestos-related claims and associated lawsuits were pending on court dockets against Ingersoll-Rand, Old Trane and their affiliates. Through the Corporate Restructuring, liability associated with such lawsuits has been purportedly transferred to the Debtors.

136. In sum, from the outset, the primary objective of the Corporate Restructuring was to allow Defendants (and other entities within the Trane Organization other than Aldrich and Murray) to operate outside of bankruptcy while subjecting asbestos creditors to the stay imposed

---

[18] TRANE_00007527 (May 27, 2020 electronic chat between E. Hankins and R. Paeper).

[19] TRANE_00007527 (May 27, 2020 electronic chat between E. Hankins and R. Paeper).

[20] TRANE_00007527 (May 27, 2020 electronic chat between E. Hankins and R. Paeper).

by section 362 of the Bankruptcy Code and a preliminary injunction that would deprive such creditors of any recovery unless or until they consent to a chapter 11 plan of reorganization that resolves Aldrich's and Murray's asbestos liabilities for a fraction of what the Trane Organization was paying outside of bankruptcy. Defendants were well aware of the *Garlock* asbestos estimation trial, and that a similar estimation had been sought in *Bestwall*, and their goal in directing, authorizing, and engaging in the Corporate Restructuring and filing of chapter 11 bankruptcy petitions was to gain leverage against asbestos victims and their families. In addition, asbestos victims and their families would be subjected to the bankruptcy claims process and estimation, all as part of an effort to seek to reduce recoveries to a fraction of what they might recover if not for the bankruptcy. Meanwhile Defendants could continue to operate outside of bankruptcy and timely pay their non-asbestos creditors in the ordinary course.

137.    The corporate transactions comprising the Corporate Restructuring were made by Defendants (in their capacity as successors to Old TTC and Old Trane, as well as alter egos of the Debtors) with the intent to hinder, delay, or defraud asbestos victims and their families and curtail their rights to pursue and recover on their claims. The Corporate Restructuring and eventual bankruptcies of Aldrich and Murray had a material, negative effect on the ability of current and future asbestos claimants to recover on their claims. Among other things, the Corporate Restructuring and resulting bankruptcies were intended to eliminate and/or divest the Trane Organization of its obligations to asbestos claimants through the creation of Aldrich and Murray and allocation of all of the asbestos liabilities to those entities without direct access to the assets of Ingersoll-Rand and Old Trane that were apportioned to New TTC and New Trane, respectively, in violation of applicable law including, without limitation, Section 10.901 of the TBOC and applicable state and federal fraudulent transfer laws.

138.    In addition, the Corporate Restructuring resulted in Aldrich and Murray receiving less than a reasonably equivalent value in exchange for the asbestos liabilities of Ingersoll-Rand and Old Trane that they were allocated, and also (i) rendered Aldrich and Murray insolvent; (ii) left Aldrich and Murray with unreasonably small amounts of assets in relation to their liabilities; and/or (iii) resulted in Aldrich and Murray intending to incur, or believing that they would incur, asbestos debts beyond their ability to pay such asbestos liabilities as they became due.

139.    As a result of both the actual and constructive fraudulent transfers, the Corporate Restructuring engaged in by Defendants should be avoided and the property transferred to Defendants should be recovered for the benefit of the Debtors, their estates, and their creditors.

## VII.    DEFENDANTS ARE THE ALTER EGO OF THE DEBTORS AND THE CORPORATE VEILS SHOULD BE PIERCED

140.    At all relevant times, Defendants were the alter egos of the Debtors such that the Debtors were mere instrumentalities of the Defendants, and the corporate separateness of the Debtors and Defendants should therefore be disregarded.  As such, Defendants are liable for the fraudulent transfer as alter egos of the Debtors.  Similarly, and in the alternative to direct liability, New TTC and New Trane are liable for the fraudulent transfer as alter egos of the Debtors.

141.    As set forth herein, Defendants completely dominated the finances, policies and business practices of the Debtors, so that the Debtors had no separate existence of their own. Defendants used their control over Aldrich and Murray to perpetrate the fraudulent transfers to the detriment of the Debtors' estates and the asbestos claimants.

142.    A unity of interest in ownership and control has existed at all relevant times between Defendants and the Debtors, such that, to the extent any individuality and separateness ever existed, it has ceased, rendering Defendants the alter egos of Aldrich and Murray.  As such, adherence to the fiction of Aldrich's and Murray's existence as entities separate and distinct from

Defendants would permit an abuse of corporate privilege and would promote injustice.

143.    For example, at all relevant times, Defendants have manipulated and controlled the Debtors for their personal benefit, thereby treating the Debtors as their alter egos rather than separate entities.

144.    At all relevant times, Defendants have exercised complete dominion and control over the Debtors, instead managing and controlling the operations and decision making of Aldrich and Murray—including the decision to file for bankruptcy—and causing Aldrich and Murray to hold meetings of the Debtor Boards that were mere formalities intended to lend an air of legitimacy to the Debtors' operations and decision-making.   Among other things, the Debtor Boards were appointed by Trane plc's senior leadership (including Mr. Turtz) and were comprised of current and former executives and employees within the Trane Organization.   Indeed, in a December 4, 2019 email—before the divisional mergers and bankruptcies—addressed to Mr. Valdes, Mr. Paeper expressed skepticism of the Debtor Boards' independence, writing that "Trane maintains equity ownership and control of the board of the bankrupt and operating entities."[21]   In addition, key officers at the Debtors were appointed from and/or held overlapping positions at entities within the Trane Organization, including Mr. Valdes, who not only serves on both Debtor Boards, but is the Debtors' President and is also a director and President of 200 Park and Climate Labs, and Vice President Project Management, The Americas, Trane Commercial HVAC, at New TTC; Ms. Roeder, who serves on both Debtor Boards and the boards of the Debtors' subsidiaries, 200 Park and ClimateLabs, and is also the Chief Financial Officer and Treasurer for the Debtors, as well as the Finance-Director—Information Technology & Legal at both New TTC; Mr. Tananbaum, who

---

[21] Dec. 4, 2019 email from R. Paeper to M. Valdes (cc: D. Simmons, L. Knapp) re: "Omega Update – Confidential (TRANE_00006711) (emphasis in original).

is currently the Chief Legal Officer and Secretary for both Debtors as well as Deputy General Counsel-Product Litigation at New TTC; and Mr. Pittard, who serves as the Chief Restructuring Officer of the Debtors as well as the Transformation Office Leader at Trane plc. Indeed, the Debtors have no independent employees; any employees that serve the Debtors are or were seconded from New TTC. Moreover, despite holding several meetings of Aldrich's and Murray's boards of managers where the Debtor Boards purportedly evaluated four options for addressing the asbestos liabilities, these meetings were mere formalities; bankruptcy filings by Aldrich and Murray were always the only option and the sole reason for the Corporate Restructuring, and the decision to file the bankruptcies was made prior to the purported independent decisions by the Debtors' Boards. As such, Defendants exerted complete dominion and control over Aldrich and Murray in connection with the Corporate Restructuring and bankruptcy filings and thus could ensure that Aldrich and Murray would file their chapter 11 petitions as planned in order to hinder, delay, and defraud asbestos creditors and/or effectuate a constructive fraudulent transfer.

145. From Aldrich's and Murray's inceptions and at all relevant times, Defendants intentionally undercapitalized Aldrich and Murray for the benefit of Defendants. As explained above, apart from whatever contingent rights exist under the Funding Agreements between Aldrich and Murray and their affiliate or parent company, New TTC (in the case of Aldrich) and New Trane (in the case of Murray), Aldrich and Murray lack the ability to pay asbestos claims that they assumed responsibility for in the Corporate Restructuring.

146. At all relevant times, Defendants have used Aldrich and Murray as mere instrumentalities to avoid or seek to reduce the full extent of the asbestos liabilities facing Ingersoll-Rand and Old Trane. As set forth herein, among other things, (i) Aldrich and Murray were never adequately capitalized, and their equity interest is zero; (ii) Aldrich's and Murray's

boards of managers are completely controlled by Defendants; (iii) Aldrich and Murray were rendered insolvent as a result of the Corporate Restructuring; (iv) Aldrich and Murray are the result of the fragmentation of Ingersoll-Rand and Old Trane, respectively, to isolate asbestos liabilities; and (v) Aldrich and Murray were created for the purposes of accomplishing a fraud and effectuating a fraudulent transfer.

147.    Thus, as set forth herein, Aldrich and Murray do not have a separate mind, will, or existence of their own from that of the Defendants.  The Defendants have exercised complete dominion and control over Aldrich and Murray, to an extent that any individuality and separateness of Aldrich and Murray from Defendants did not and does not exist, thus rendering Aldrich and Murray mere shells, instrumentalities, and conduits by which Defendants carried out their plan to hinder, delay, and defraud asbestos creditors and to effectuate a constructive fraudulent transfer. For these reasons, Aldrich and Murray are the alter egos of Defendants, thus rendering Defendants liable for the fraudulent transfer set forth herein.

148.    In addition, for these same reasons, in these circumstances the protection provided to separate corporate entities should be disregarded, the corporate veils should be pierced, and Defendants should be held liable for the liabilities of Aldrich and Murray.

149.    In short, the corporate veils should be pierced, and Defendants should be held liable for the liabilities of Aldrich and Murray through avoidance of the Corporate Restructuring.  In addition, Aldrich and Murray, as the fraudulently created entities to isolate asbestos liabilities and the complete dominance and control exercised by Defendants, are the alter egos of Defendants.

## COUNT I
**Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550**
**(Against All Defendants)**

150.    Plaintiff repeats and incorporates the allegations set forth in this Complaint as

though fully set forth herein.

151.    Section 548 of the Bankruptcy Code allows for avoidance of actual fraudulent transfers made on or within two years prior to the Petition Date.  *See* 11 U.S.C. § 548(a)(1)(A). Section 548(a)(1)(A) provides that a transfer or obligation is voidable if such transfer or obligation was made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." *Id*.

152.    Section 550 of the Bankruptcy Code provides for remedies in the event of a voidable transfer including, without limitation, recovery of the property transferred.  *See* 11 U.S.C. § 550.

153.    Prior to the Corporate Restructuring, Ingersoll-Rand and Old Trane and their affiliated entities were defendants in many thousands of asbestos-related actions.  However, beginning in mid-2019 and into the spring of 2020, Defendants secretly planned and implemented the Corporate Restructuring and eventual bankruptcies of entities with only limited assets and to which all existing and future asbestos-related claims against Ingersoll-Rand and Old Trane would be assigned, for the purpose of hindering and delaying payments to existing and future asbestos victims.

154.    The transfers occurring as a result of the Corporate Restructuring were effectuated by and among insiders, namely, Defendants, and their directors and officers, among others, by and on behalf of the Debtors' respective predecessors.

155.    Defendants took active steps to conceal the Corporate Restructuring.  Prior to the Corporate Restructuring, Ingersoll-Rand and Old Trane and their affiliated entities had been named in many thousands of actions that were pending or threatened at the time of the Corporate

Restructuring.[22]  There was no notice of the Corporate Restructuring provided to Ingersoll-Rand's and Old Trane's asbestos creditors.  The Corporate Restructuring itself also effectuated a concealment of assets from Old Ingersoll-Rand's and Old Trane's creditors.  Among other things, all Project Omega team members were required to execute nondisclosure agreements prior to working on the Corporate Restructuring.

156.    The Corporate Restructuring effectuated a transfer of substantially all of Ingersoll-Rand's and Old Trane's assets and all of Ingersoll-Rand's and Old Trane's non-asbestos liabilities to New TTC and New Trane, respectively.

157.    In sum, as set forth herein, among other things, (i) the asbestos obligations incurred by Aldrich and Murray as a result of the Corporate Restructuring were from Defendants, who were insiders of Aldrich and Murray; (ii) Aldrich and Murray, saddled with the asbestos liabilities and without direct access to the assets of Ingersoll-Rand and Old Trane that were apportioned to New TTC and New Trane, respectively, remained and remain liable for those obligations after the Corporate Restructuring; (iii) the Corporate Restructuring was actively concealed from asbestos victims and their families; (iv) prior to the Corporate Restructuring, there were many thousands of claims that had been filed, were pending, or threatened against Aldrich's and Murray's predecessors-in-interest, Ingersoll-Rand and Old Trane; and (v) Aldrich and Murray were rendered insolvent as a result of the Corporate Restructuring, and, indeed, were specifically intended as a result of the Corporate Restructuring to be utterly beholden to funding from New TTC and New Trane.

158.    As discussed in greater detail herein, Defendants were the alter egos of the Debtors

---

[22] *See, e.g.*, Schedules of Assets and Liabilities for Aldrich Pump LLC Case No. 20-30608 (ECF No. 207); Schedules of Assets and Liabilities for Murray Boiler LLC Case No. 20-30609 (ECF No. 19).

such that the Debtors were mere instrumentalities of Defendants, and the corporate separateness of the Debtors and Defendants should, therefore, be disregarded.

159.    The Corporate Restructuring was intended to hinder and delay—for years—recoveries to asbestos victims, and to impair recoveries through use of the bankruptcy process. The Corporate Restructuring created Aldrich and Murray as empty shells, with few (insufficient) assets, employees and operations, and wholly dependent on Defendants for any ability to pay their creditors, which creditors consist only of asbestos creditors, leaving all non-asbestos creditors completely unaffected by the Corporate Restructuring.  Defendants, therefore, effectuated the Corporate Restructuring with actual intent to hinder, delay, and defraud their asbestos creditors. Accordingly, the Corporate Restructuring should be avoided.

## COUNT II
**Actual Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act (Against All Defendants)**

160.    Plaintiff repeats and incorporates the allegations set forth in this Complaint as though fully set forth herein.

161.    Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "a transfer of an interest of the debtor in property or any obligation that is incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable . . . ." "[A]pplicable law" includes state law.

162.    Section 550 of the Bankruptcy Code provides for remedies in the event of a voidable transfer including, without limitation, recovery of the property transferred.

163.    The Uniform Fraudulent Transfer Act (the "UFTA") in Texas ("TUFTA") provides that a transfer is fraudulent if the debtor made the transfer with actual intent to hinder, delay, or defraud any of its creditors.  *See* Tex. Bus. & Com. Code Ann. § 24.005(a)(1).  TUFTA also

provides for remedies in the event of a voidable transfer including, without limitation, avoidance of the transfer, injunctions against further disposition of the property, and "any other relief the circumstances may require." *Id.* § 24.008(a). Under Texas law, courts of equity (including bankruptcy courts) have the authority to assess exemplary damages. Such rights and remedies remain unabridged by the divisional merger. *See* TBOC § 10-901.

164.    Similar to TUFTA, the Delaware Uniform Fraudulent Transfer Act ("DUFTA") and New Jersey Uniform Fraudulent Transfer Act ("NJUFTA") provide that a transfer is fraudulent if the debtor made the transfer with actual intent to hinder, delay, or defraud any of its creditors. *See* 6 Del. Code Ann. §§ 1304(a)(1); N.J. Stat. Ann. § 25:2-25(a).

165.    North Carolina has adopted the Uniform Voidable Transactions Act ("UVTA"), which is substantially similar to the UFTA. *See* N.C. Gen. Stat. §§ 39-23.1-39-23.12. Like the UFTA, the UVTA prohibits actual fraudulent transfers and provides for avoidance of the transfer.

166.    In determining such actual intent, courts look to the non-exclusive badges of fraud delineated in the UFTA and UVTA. *See* Tex. Bus. & Com. Code Ann. § 24.005(b); 6 Del. Code Ann. § 1304(b); N.J. Stat. Ann. § 25:2-26; N.C. Gen. Stat. § 39-23.4(b).

167.    Prior to the Corporate Restructuring, Ingersoll-Rand and Old Trane and their affiliated entities were defendants in many thousands of asbestos-related actions. However, beginning in mid-2019 and into the spring of 2020, Defendants secretly planned and implemented the Corporate Restructuring and eventual bankruptcies of entities with only limited assets and to which all existing and future asbestos-related claims against Ingersoll-Rand and Old Trane would be assigned, for the purpose of hindering and delaying payments to existing and future asbestos victims.

168.    The transfers occurring as a result of the Corporate Restructuring were effectuated

by and among insiders, namely, the Defendants, and their directors and officers, among others, by and on behalf of the Debtors' respective predecessors.

169.    Defendants took active steps to conceal the Corporate Restructuring.  Prior to the Corporate Restructuring, Ingersoll-Rand and Old Trane and their affiliated entities had been named in many thousands of actions that were pending or threatened at the time of the Corporate Restructuring.[23]  There was no notice of the Corporate Restructuring provided to Ingersoll-Rand's and Old Trane's asbestos creditors.  The Corporate Restructuring itself also effectuated a concealment of assets from Old Ingersoll-Rand's and Old Trane's creditors.  Among other things, all Project Omega team members were required to execute nondisclosure agreements prior to working on the Corporate Restructuring.

170.    The Corporate Restructuring effectuated a transfer of substantially all of Ingersoll-Rand's and Old Trane's assets and all of Ingersoll-Rand's and Old Trane's non-asbestos liabilities to New TTC and New Trane, respectively.

171.    The Corporate Restructuring abridged the rights of holders of asbestos-related claims under existing laws, in violation of TBOC § 10.901.

172.    Therefore, in sum, (i) prior to the Corporate Restructuring, Ingersoll-Rand and Old Trane had been sued or threatened with asbestos-related lawsuits; (ii) beginning in mid-2019 and into 2020, Defendants secretly planned the Corporate Restructuring for the purpose of avoiding obligations to existing and future creditors; (iii) the Corporate Restructuring was intentionally concealed from people both outside and within the Trane Organization, (iv) Defendants intentionally engaged in the Corporate Restructuring to evade Ingersoll-Rand's and Old Trane's

---

[23] *See, e.g.*, Schedules of Assets and Liabilities for Aldrich Pump LLC Case No. 20-30608 (ECF No. 207 Schedules of Assets and Liabilities for Murray Boiler LLC Case No. 20-30609 (ECF No. 19).

asbestos liabilities and, as a result, potentially hundreds of millions of dollars, if not billions, were placed beyond the reach of asbestos claimants; (v) the Corporate Restructuring allocated substantially all of Ingersoll-Rand's assets to TTC and Old Trane's assets to New Trane, leaving all of the asbestos liabilities—and only the asbestos-liabilities—with Aldrich and Murray; and (vi) the Corporate Restructuring was effectuated by and benefitted insiders, *i.e.*, Defendants and other affiliates within the Trane Organization.

173.    The Corporate Restructuring was intended to hinder and delay—for years—recoveries to asbestos victims, and to impair recoveries through use of the bankruptcy process. The Corporate Restructuring created Aldrich and Murray as empty shells, with few (insufficient) assets, employees or operations, and wholly dependent on Defendants for any ability to pay their creditors, which creditors consist only of asbestos creditors, with all non-asbestos creditors completely unaffected by the Corporate Restructuring.  Defendants, therefore, effectuated the Corporate Restructuring with actual intent to hinder, delay, and defraud their asbestos creditors. Accordingly, the Corporate Restructuring should therefore be avoided.

174.    As discussed in greater detail herein, Defendants were the alter egos of the Debtors such that the Debtors were mere instrumentalities of Defendants, and the corporate separateness of the Debtors and Defendants should, therefore, be disregarded.

## COUNT III
### Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550
### (Against All Defendants)

175.    Plaintiff repeats and incorporates the allegations set forth in this Complaint as though fully set forth herein.

176.    Section 548 of the Bankruptcy Code provides for avoidance of constructive fraudulent transfers made on or within two years prior to the Petition Date.  *See* 11 U.S.C.

§ 548(a)(1)(B).  Section 550 of the Bankruptcy Code provides for remedies in the event of a

voidable transfer including, without limitation, recovery of the property transferred.  Pursuant to

sections 548(a)(1)(B) and 550 of the Bankruptcy Code, (i) the Corporate Restructuring caused

Aldrich and Murray to incur obligations, (ii) within two years of the Petition Date, (iii) for which

Aldrich and Murray received less than reasonably equivalent value, and (iv) Aldrich and Murray

were rendered insolvent as a result of the incurrence of the asbestos liabilities assigned to Aldrich

and Murray.

177.    The Corporate Restructuring should therefore be avoided as a constructive

fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550.

### <u>COUNT IV</u>
**Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b) and the Uniform
Fraudulent Transfer Act and/or Uniform Voidable Transactions Act
(Against All Defendants)**

178.    Plaintiff repeats and incorporates the allegations set forth in this Complaint as

though fully set forth herein.

179.    Section 544(b)(1) of the Bankruptcy Code provides that a trustee may avoid "a

transfer of an interest of the debtor in property or any obligation that is incurred by the debtor that

is voidable under applicable law by a creditor holding an unsecured claim that is allowable . . . ."

"[A]pplicable law" includes state law.

180.    Section 550 of the Bankruptcy Code provides for remedies in the event of a

voidable transfer including, without limitation, recovery of the property transferred.

181.    The TUFTA, DUFTA, and NJUFTA provide in relevant part that a transfer made

or obligation incurred by a debtor is "fraudulent" as to a creditor ("whether the creditor's claim

arose before or within a reasonable time after the transfer was made or the obligation was

incurred") if (i) the transfer was made "without receiving a reasonably equivalent value in

exchange for the transfer or obligation" and (ii) the debtor (a) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;" or (b) was "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Tex. Bus. & Com. Code Ann. § 24.005(a)(2); *see also* 6 Del. Code Ann. § 1304(a)(2); N.J. Stat. Ann. § 25:2-25(b). TUFTA, DUFTA, and NJUFTA further provide that a transfer made or obligation incurred by a debtor is "fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Tex. Bus. & Com. Code Ann. § 24.006(a); 6 Del. Code Ann. § 1305(a); N.J. Stat. Ann. § 25:2-27(a). TUFTA, DUFTA, and NJUFTA additionally provide for remedies in the event of a voidable transfer including, without limitation, avoidance of the transfer or obligation, injunctions against further disposition of the property, and "any other relief the circumstances may require." Tex. Bus. & Com. Code Ann. § 24.008(a); 6 Del. Code Ann. § 1307(a); N.J. Stat. Ann. § 25:2-29(a).

182.    The law in North Carolina under the UVTA is substantially similar. The North Carolina UVTA ("NUVTA") provides that a transfer made or obligation incurred by a debtor is "voidable" as to a creditor ("whether the creditor's claim arose before or after the transfer was made or the obligation was incurred") if (i) the transfer was made "without receiving a reasonably equivalent value in exchange for the transfer or obligation" and (ii) the debtor (a) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;" or (b) was "intended to incur,

or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." N.C. Gen. Stat. Ann. § 39-23.4(a)(2). NUVTA further provides that a transfer made or obligation incurred by a debtor is "voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." N.C. Gen. Stat. Ann. § 39-23.5(a). NUVTA also provides for remedies in the event of a voidable transfer including, without limitation, avoidance of the transfer or obligation, injunctions against further disposition of the property, and "any other relief the circumstances may require." N.C. Gen. Stat. Ann. § 39-23.7(a).

183.   As set forth herein, the Corporate Restructuring resulted in Aldrich and Murray assuming Ingersoll-Rand's and Old Trane's asbestos liabilities without receiving reasonably equivalent value in exchange, and, as a result of the Corporate Restructuring, Aldrich and Murray were (i) rendered insolvent; (ii) left with an unreasonably small amount of assets in relation to their liabilities and thus were engaged in business or a transaction for which the property and assets remaining with Aldrich and Murray were an unreasonably small capital; and/or (iii) intended to incur, or believed or reasonably should have believed that Aldrich and Murray would incur, asbestos debts beyond the ability of Aldrich and Murray to pay such asbestos liabilities as they became due.

184.   Accordingly, the Corporate Restructuring should therefore be avoided as a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b)(1); Tex. Bus. & Com. Code Ann. §§ 24.005(a)(2), 24.006(a), 24.008(a); Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305(a), 1307(a); N.J. Stat. Ann. §§ 25:2-25(b), 25:2-27(a), 25:2-29(a); and N.C. Gen. Stat. Ann. §§ 39-23.4(a)(2), 39-

23.5(a), 39-23.7(a).

## JURY DEMAND

185.    Plaintiff demands a jury trial on all issues so triable.

## RESERVATION OF RIGHTS

186.    Plaintiff intends to conduct further investigation and discovery in relation to the Corporate Restructuring (including the Debtors' bankruptcies) and there are ongoing discovery disputes with various parties, including Defendants.  Plaintiff therefore expressly reserves the right to bring additional claims, including, without limitation, claims discovered as a result of Plaintiff's ongoing efforts to obtain additional information from Defendants and parties affiliated with Defendants related to the Corporate Restructuring and resulting bankruptcies of Aldrich and Murray.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor against each of the Defendants:

A.      Avoiding the Corporate Restructuring that separated Ingersoll-Rand's and Old Trane's asbestos liabilities from Defendants' assets for the benefit of the Debtors, the Debtors' estates, and the Debtors' creditors and recovering, for the benefit of the Debtors' estates, the property transferred;

B.      Finding that Defendants completely dominate the Debtors, such that the Debtors are the alter ego or mere instrumentality of Defendants;

C.      Finding that New TTC is the successor of Old IRNJ and Aldrich and the asbestos liabilities that were transferred to Aldrich and is therefore liable as such;

D.      Finding that New Trane is the successor of Old Trane and Murray and the asbestos liabilities that were transferred to Murray and therefore is liable as such;

E.      Finding that Defendants' conduct was wanton, willful, malicious, and outrageous, and was done intentionally or with subjective appreciation and conscious disregard for the risk of harm to the legal rights and interests of a very limited and specific subset of Ingersoll-Rand's and Old Trane's creditors—namely, the victims of asbestos exposure caused by the conduct of Ingersoll-Rand and Old Trane and their predecessors—thereby justifying the imposition and recovery of punitive damages for the benefit of the Debtors, the Debtors' estates, and the Debtors' creditors, and post-judgment interest thereon;

F.      Awarding Plaintiff's attorneys' fees and the costs and disbursements of this action; and

G.      Granting such other and further relief, sounding in law or in equity, as the Court may deem just and proper.

[signature page to follow]

Respectfully submitted,

HAMILTON STEPHENS STEELE
+ MARTIN, PLLC

*/s/ Robert A. Cox, Jr.*
Glenn C. Thompson (Bar No. 37221)
Robert A. Cox, Jr. (Bar No. 21998)
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
Telephone: (704) 344-1117
Facsimile: (704) 344-1483
Email:  gthompson@lawhssm.com
        rcox@lawhssm.com

*Local Counsel for the Official Committee of*
*Asbestos Personal Injury Claimants*

WINSTON & STRAWN LLP
David Neier (admitted *pro hac vice*)
George Mastoris (admitted *pro hac vice*)
Carrie V. Hardman (admitted *pro hac vice*)
Benjamin Sokoly (admitted *pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Fax: (212) 294-4700
Email: dneier@winston.com
       gmastoris@winston.com
       chardman@winston.com
       bsokoly@winston.com

*Special Litigation Counsel to the Official Committee*
*of Asbestos Personal Injury Claimants*

CAPLIN & DRYSDALE, CHARTERED
Kevin C. Maclay (admitted *pro hac vice*)
Jeffrey A. Liesemer (admitted *pro hac vice*)
Todd E. Phillips (admitted *pro hac vice*)
One Thomas Circle NW, Suite 1100
Washington, DC 20005
Telephone: (202) 862-5000
Facsimile: (202) 429-3301
Email: kmaclay@capdale.com
       jliesemer@capdale.com
       tphillips@capdale.com

*Counsel to the Official Committee of Asbestos*
*Personal Injury Claimants*

ROBINSON & COLE LLP
Natalie D. Ramsey (admitted *pro hac vice*)
Davis Lee Wright (admitted *pro hac vice*)
1201 North Market Street, Suite 1406
Wilmington, Delaware 19801
Telephone: (302) 516-1700
Facsimile: (302) 516-1699
Email: nramsey@rc.com
       dwright@rc.com

*Counsel to the Official Committee*
*of Asbestos Personal Injury Claimants*

Dated: June 18, 2022